IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LADELL DEANGELO BROWN,

Petitioner,                              No. CIV S-07-1994 LKK CHS P

vs.

R. HORELL, et. al.,

Respondents.          <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

## I.  INTRODUCTION

Petitioner LaDell DeAngelo Brown is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. §2254.  In 2005, Brown was convicted in case 02F03173 in the Sacramento County Superior Court of first degree murder, attempted murder, and attempted robbery with enhancements for firearm use and prior convictions.  He was sentenced to life without the possibility of parole plus an additional term of 74 years to life.  In his petition, Brown claims that (A) his coerced and involuntary admission was improperly admitted into evidence at trial; and (B) he was prevented from presenting a complete defense when the trial judge excluded expert testimony regarding the interrogation methods used by law enforcement at his interviews.  For the reasons that follow, the claims are without merit and the petition should be denied.

## II.  FACTUAL BACKGROUND

The following facts are drawn from the unpublished opinion of the California Appellate Court, Third District, Case No. C050121.[1]  Petitioner is the defendant referred to therein:

> Jaynelle Frank checked into room 106 at the Gold Rush Inn in Sacramento on Monday, April 8, 2002. Defendant, the father of Jaynelle's unborn child, was staying at the Inn with her. Jaynelle's younger sister, Johtell Frank, checked into room 108 at the Gold Rush Inn on the same day. With Johtell at the Inn was her boyfriend and defendant's best friend, Dante Alexander.
>
> The victims, Victor Jones and his wife Cheryl, checked into room 207 at the Gold Rush Inn early the following evening, Tuesday, April 9, 2002, at approximately 5:00 or 6:00 p.m. Prior to meeting defendant, Victor purchased and consumed a quantity of cocaine on G Parkway before returning to the Inn around 12:00 a.m. on April 9. Victor met defendant in the parking lot at about midnight on April 9 and bought cocaine from him.
>
> Later, in the early morning hours of April 10, defendant sold Victor more cocaine. Over the next several hours, Victor purchased approximately $100 worth of cocaine from defendant on credit. In exchange for the extension of credit, Victor allowed defendant to borrow his Kia van, which was on loan from the dealership. Defendant left in the van with Dante and returned around 2:00 or 2:30 a.m. Victor purchased more cocaine on credit and defendant kept the car keys. When Victor went to defendant's room between 4:00 and 5:00 a.m. to ask for more cocaine, defendant told him he had no more.
>
> Around 8:00 a.m. on April 10, defendant and Jaynelle accompanied Victor to pick up and cash his paycheck. Defendant saw Victor's paycheck which was over $500. Victor paid defendant what he owed for the cocaine, and defendant asked if he could borrow the van to take Jaynelle to her prenatal appointment. Victor agreed when defendant promised to sell him more cocaine.
>
> Defendant took the van, and Victor and his wife stayed at the Inn to smoke the cocaine. Defendant checked in with Victor from time to time, sold him more cocaine, and left again with Dante in the van. Victor received a telephone call from defendant around 6:00 p.m. on April 10 informing him that the van had been stolen. Victor did not believe the story and told defendant to return to the Inn.

[1] C050121 opinion is lodged in this record as #11 (1/25/08).

When defendant returned to the Inn with Dante about 20 minutes later, Victor bought more cocaine. Victor told the defendant the explanation about the van was "bullshit" and demanded to know how defendant planned to make things right. When Victor suggested defendant return the money he had already paid for cocaine, defendant gave Victor $20 and a quarter ounce of cocaine. Satisfied, Victor told defendant he would pay for Jaynelle's room so defendant would not have to "hustle" that night for the money. Victor walked with defendant and Dante to a liquor store where Victor bought alcohol for all of them.

Shortly after Victor returned to his room, Dante's girlfriend Johtell appeared at his door. She claimed an interest in the cocaine defendant had given Victor as compensation for loss of the van. Victor verbally rebuffed Johtell and later complained to Dante about her conduct. Victor continued to smoke cocaine and think about how he could get defendant to return the van.

Around midnight, Johtell and Dante came to Victor's room and asked him to buy more liquor for them. Victor agreed to walk to the store, but they insisted on giving him a ride. Cheryl decided to go along. Victor emptied his pockets of cash and illegal items before leaving the room. Dante and Johtell went downstairs ahead of Victor. Victor heard Jaynelle say to Johtell, "You know what they about to do? That's fucked up."

The four left the Inn with Johtell driving Dante's car, Cheryl next to her in the front seat, Dante in the back seat on the driver's side, and Victor in the back seat on the passenger side. Instead of driving to the liquor store, Johtell headed south on Highway 99 and turned off the freeway at Sheldon Road in Elk Grove. En route, Johtell ignored Victor's repeated demands to pull over and let him get out of the car. Johtell was driving erratically while talking with someone on her cell phone. Victor also observed what he thought was a police car following them. It flashed its high beams once they left the freeway.

Johtell drove east on Sheldon Road and stopped the car on a dark, dead-end street. The second car pulled up behind Dante's car. Dante stepped out of his car, turned toward Victor with what Victor described as a .45-caliber handgun, and said, "Give me everything you got." Victor gave Dante $12, his wallet, wrist watch and room key. Defendant walked up with an automatic rifle and ordered Cheryl and Victor out of the car. He demanded to know where the narcotics were. Victor explained he left the cocaine in the room. Johtell confirmed that she had seen Victor empty his pockets into a drawer before they left.

Victor tried to stay in front of Cheryl as they got out of the car. He noticed a light in a nearby house. Victor began talking loudly and

3

tried to maneuver in the direction of the house. Defendant told him to be quiet. Victor continued to talk, offering to give defendant more money later that day if he let Cheryl leave. Finally, Victor charged past defendant and Dante. Cheryl was supposed to run the opposite direction. Dante shot Victor once as he ran, but Victor continued toward the house. Victor then heard both guns firing and received two more wounds. He was close to the front door of the house when his foot was shot from under him. Victor looked back and saw defendant use the rifle to shoot Cheryl.

Victor broke the windows around the front door of the house and yelled for help. Defendant approached Victor on the porch, holding the handgun Dante had in the car. Defendant pointed the gun at Victor's head. One of the cars departed, leaving defendant behind. After the gun misfired several times, defendant came close to Victor and said, "You are a lucky mother fucker." Victor responded, "You are a dead mother fucker, you understand." Defendant drove away.

Owen Autry, the occupant of the house, was awakened by gunfire at 1:30 a.m., and immediately telephoned 911. While Autry stayed on the line with the 911 operator, Victor yelled that the people who shot him were in apartments 106 and 108.

Cheryl died at the scene. Based on the size of the wounds, the pathologist testified the bullet was likely fired at close range by a .223 assault rifle.

Victor suffered four bullet wounds, but survived. He viewed a photo array six hours after the incident and identified Dante as the man in room 108 who had the handgun. He viewed more photos the following day and identified defendant as the man in room 106 who had the rifle. Victor testified at trial.

(C050121 Opinion at 1 -3.)

### III.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. §2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (*citing Engle v. Isaac*, 456 U.S. 107, 119 (1982)). This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Lindh v. Murphy*, 521

U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359 (9th Cir. 1999).  Under

AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in

state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v.

Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

The "contrary to" and "unreasonable application" clauses of §2254(d)(1) are

different.  Under the "contrary to" clause of §2254(d)(1), a federal court may grant the writ only

if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a

question of law or if the state court decides the case differently than the Supreme Court has on a

set of materially indistinguishable facts.  *Williams*, 529 U.S. at 405.  As the Third Circuit has

explained, "it is not sufficient for the petitioner to show merely that his interpretation of Supreme

Court precedent is more plausible than the state court's; rather, the petitioner must demonstrate

that Supreme Court precedent *requires* the contrary outcome."  *Matteo v. Superintendent*, *SCI

Albion*, 171 F.3d 877, 888 (3rd Cir. 1999) (en banc) (emphasis in original).  The state court is not

required to cite the specific controlling test or Supreme Court authority, so long as neither the

reasoning nor the result of the state court decision contradict either.  *Early v. Packer*, 537 U.S. 3,

8-9 (2002).

The court may grant relief under the "unreasonable application" clause if the state

court correctly identifies the governing legal principle but unreasonably applies it to the facts of

the particular case.  *Williams*, 529 U.S. at 410.  The focus of this inquiry is whether the state

court's application of clearly established federal law is objectively unreasonable.  *Id*.  "[A]

federal habeas court may not issue the writ simply because that court concludes in its

independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Id*.

This court will look to the last reasoned state court decision in determining whether the law applied to a particular claim by the state courts was contrary to the law set forth in the cases of the United States Supreme Court or whether an unreasonable application of such law has occurred. *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002), *cert. dismissed*, 538 U.S. 919 (2003).  If relief is precluded by 28 U.S.C. §2254(d), the court may deny the petition without addressing the merits of the claim.  *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).

## IV.  ANALYSIS OF PETITIONER'S CLAIMS

### A.    Involuntary/Coerced Confession

Brown was interrogated three times about the crimes for which he was convicted. He gave a different version of events each time, described by the state appellate court as follows:

> 1. April 12, 2002 Interview:
>
> The first interview took place on April 12, 2002, when Sacramento County Sheriff's detectives Will Bayles and Grant Stomsvik questioned defendant the night he was picked up for a parole violation. Detective Bayles advised defendant of his *Miranda* rights, and explained: "[T]here was a homicide that occurred out in Elk Grove, off of Sheldon Road out there, and your name was thrown out into this mix. Okay? And so I'd like to hear your side of the story, and if some people are saying things that aren't true, or if they are true, you just let me know. Okay?"
>
> Informed of the date and time of the homicide, defendant told the detectives he had spent the night of Wednesday, April 10, at his mother's boyfriend's house with his girlfriend Jaynelle. He acknowledged that Jaynelle had a room at the Gold Rush Inn, but denied being there at any time during the week of the shooting. The detectives showed defendant a picture of Victor, explaining, "This is the man who was shot, okay, and he survived." Defendant initially denied knowing Victor. When shown a surveillance photo of defendant with Victor from a 7-Eleven store in Rancho Cordova, defendant admitted he had accompanied Victor to a bank and a store because the man owed him money for cocaine. Defendant insisted that Victor was "just some guy ... off the streets." On further questioning, defendant admitted he spent time at the Gold Rush Inn, had been in Victor's room, sold him more

cocaine, and borrowed and wrecked Victor's van.

The detectives urged defendant to stop lying about his whereabouts the night of the shooting. They told defendant, "Here's the deal. Dante screwed you so far.... Dante says that you're the one that killed the girl. That's where we're goin'....[¶] ... [¶] [P]lanned it all, provided the guns, and you shot the lady. If you did all that you're kind of screwed." Defendant denied doing "all that." Detective Bayles responded, "If you didn't do all that ... you're on a truthful path right now, you might want to stay on it and tell the truth just really, really what happened cuz right now you're pretty well screwed. Okay?

Defendant acknowledged that he gave Victor an amount of cocaine, half of which belonged to Dante, because he had wrecked Victor's van. Victor also threatened to call the police. Defendant did not want his parole violated. Defendant said he decided to go to his mother's boyfriend's house because Dante and Johtell were angry with him.

The detectives told defendant they knew he was at the scene of the shootings. Thereafter, defendant admitted he followed Dante's car with someone named Anthony who told him they were going to get their money back. When they pulled onto a dark street off Highway 99, everyone got out of the cars except defendant. Defendant heard gunfire and saw sparks coming from Dante's gun. Someone yelled, "I missed him" or "I hit him" or "He's still alive." Defendant saw Victor run toward a house, but did not see anyone chase him. Defendant never saw the woman. Anthony got back in the car, made a U-turn, and dropped defendant off at his mother's boyfriend's house.

The detectives continued to accuse defendant of lying about his involvement in the shooting. They told defendant that Victor had identified him as one of the shooters. Defendant eventually admitted he made up the name Anthony and that Sirrano Haywood drove the car he rode in to the scene of the crime. Defendant also admitted he got out of the car with Haywood. He said he immediately got back into the car because he was scared and denied he was involved in the shooting.

The following exchange occurred near the end of the interrogation:

"DET. STOMSVIK: [W]hat do you want to do now? You're involved up to your eyeballs in a murder, attempt[ed] robbery.

"[DEFENDANT]: I wish I can go home and just lay down with my-with my girl. [¶] ... [¶] And hold her stomach and kiss-and kiss her stomach and talk to my baby through her stomach."

Detective Stomsvik did not acknowledge defendant's reference to Jaynelle and his baby. Instead, Stomsvik asked if defendant was willing to take a polygraph test. Defendant stated that he was.

2. April 15, 2002 Interview:

Detective Bayles introduced defendant to Jeanie Overall, a polygraph examiner employed by the Attorney General's Office. Overall advised defendant of his *Miranda* rights and explained he could not be forced to take the polygraph. Defendant affirmatively agreed to speak to Overall and take the polygraph examination.

Overall asked defendant several questions about his background. In response to a question regarding his marital status, defendant stated he was excited that his girlfriend Jaynelle was pregnant with his first child. He said he "was hoping [he'd] be there to see her have it." Overall answered, "That would be nice," and went on to another question. Later, when Overall asked, "What's the best thing that's happened to you in your life?" defendant responded, "Probably my girl being pregnant." Overall turned to a different topic.

With respect to the polygraph test, Overall cautioned defendant: "There's all different types and kinds of polygraph tests that people can take. The one that you're scheduled to take this evening is ... termed a specific because it's dealing with a specific thing that's happened. In this case it's the murder of Cheryl Jones.... [¶] ... [¶][T]his is the type or kind of test that this polygraph instrument was originally built and designed for. It's at its utmost accuracy and capability in this type of test. *Now due to that, I very straightforwardly advise everybody that comes in with me, if you're not gonna pass your polygraph, do not take it.* As long as everything you tell me about this case is one hundred percent the truth, you ought to take the test and show that what you're saying is true.... *If somebody really wants to, quote, beat a polygraph, the way to do it is stand up, walk out and don't take the test.* " (Italics added.) Overall explained that based on the results of the polygraph, she would report to the Sheriff's Office if she believed defendant was telling the truth. She also confirmed that although her report became part of defendant's permanent case file, the polygraph result could not be used in court. Overall then reiterated, "Now, I've been doing homicide polygraphs for a long time, and when I tell you that it requires you to be one hundred percent truthful, I really can't stress that enough. This thing does not measure deception in degrees...."

Overall questioned defendant about how he got involved in the homicide, and defendant repeated the story of his innocent presence at the scene of the shootings. She told defendant once more that she would "give a report to the people here at the sheriff's office on [his] truthfulness and [his] honesty."

During a pretest, defendant answered "No" to the following questions: (1) "Did you shoot Cheryl Jones April the 11th in Elk

8

Grove?" (2) "Did you shoot anyone in Elk Grove [on] the 11th?" (3) "Do you know where the gun is located that was used to shoot Cheryl Jones?" Defendant responded in the same manner when asked the same questions during the polygraph examination. His responses were the same on the second and third tests.

Overall informed defendant that the polygraph test showed he was lying when he responded "No" to the key questions. She continued, "[T]here is no way, Ladell, with these charts that I can do anything but report to these detectives here that you're not telling the truth about this shooting." Emphasizing that defendant was involved in "some heavy stuff," Overall told defendant, "I wish your life could have been different, and I still think you can make it different.... I want you to see that-that baby be born. I don't know why, but I feel like it's a boy." Defendant confirmed that someone else had told him the same thing.

Overall urged defendant to tell her the truth about what happened. "I don't know if you don't tell me what the truth is. I'm not a mind reader.... You have a choice you can tell the truth and try to get this mess straightened out and *let me go out there and talk to those detectives and try to do whatever I can for you,* and I want to tell your side of what happened. I can't do that if you won't tell me." (Italics added.) She offered several possible explanations for defendant's involvement as a shooter.

Overall made three references to defendant's baby during this part of the interrogation. She told defendant, "That baby growing in your girlfriend right now needs you. It's gonna need you a whole lot ... and I want to see you be able to be with that child and have a life, but only the truth is going to take you to that place." Overall suggested that defendant wanted to do the right thing and defendant responded, "Just want to be there for my baby." Overall said, "I want you to be there for your baby, and what's gonna take you there is the truth.... [¶] ... [¶] [I] want the first time that baby lays eyes on his daddy to know that his father is an honest man cuz that's all you're ever gonna be able to give him, Ladell. If you're an honest man, your son will be...."

Defendant offered another version of the events. He said he "was tryin' to talk to Victor for nothin' to happen" and placed himself between Victor and Cheryl so the two gunmen could not shoot them. According to this account, Cheryl pushed defendant, causing him to stumble. Defendant ran to the car when the guns started going off. He repeated he "[d]idn't shoot nobody."

Overall suggested she could pack up and go home. She told defendant, The "only reason I'm talkin' to you is cuz you got a baby on the way, and I'd like to see you get to be with that baby, and these [detectives] have got a case they have to work." Defendant said, "I wish I could be there for my baby." Overall responded, "I

want to see you be there for your baby.... I can't get your side of what happened out there if you don't tell me. Do you want me to go get them? Do you want to let it go down like this? Or do you want to do the right thing for yourself, for your girlfriend and for your baby?" Defendant repeated that he wanted to "be able to see the baby born." Overall said, "Okay. I want-I want that, too.... [¶][W]e need to tell them that. I can't go out there and talk to them for you if you're not going to tell me what happened." Defendant continued to deny he had a firearm or shot Cheryl.

Overall suggested that Victor, a security guard, might have had a gun or tried to hurt defendant in some way. Defendant agreed that Victor charged him and he shot at Victor with the 9-millimeter hand gun to scare him into stopping. Defendant added he was not trying to hit Victor. He maintained someone else shot Cheryl after she pushed against defendant's shoulder.

After admitting that he had shot Victor, defendant said, "This accident is gonna cost me my life." He told Overall he had lied because he was scared. He continued: "Scared for my baby. I want to be there for my baby. I wish I could go to my baby right now...." After asking defendant if he had seen Jaynelle since his arrest, she changed the subject and asked if he wanted the detectives to return.

Overall summarized the results of the polygraph, and the substance of her interview with defendant, for Detectives Bayles and Stomsvik. She indicated, "[H]e does want to be able to see his baby, and I told him I felt certain that he is gonna be able to." Stomsvik responded, "I wouldn't see why not." When Overall left the room, she said: "Ladell, good luck to you. You keep tellin' the truth, okay, and you're gonna see that baby."

Before continuing the interrogation, Detective Bayles confirmed that defendant was going to jail for murder. Defendant then repeated his story to Bayles and Stomsvik. He maintained he heard gunshots when Cheryl pushed him and caused him to stumble. Defendant said he tried to shoot at Victor's legs when Victor charged at him. He saw Dante do some shooting and "supposed" that Sirrano fired some shots. Defendant denied that he or anyone else followed Victor up to the house after he was shot. Defendant stated that Dante gave the rifle to Sirrano before they left the scene. At the end of the interrogation, defendant asked the detectives for a "big favor." He told them he wanted to kiss his girl's stomach and talk to his baby. Detective Bayles responded, "Well, you know, you're probably not gonna get to actually touch your girl-it's gonna be a while.... We'd be lying if we told you something different. I don't think you're gonna get any kind of contact visit until this whole thing is settled and you're either out or-or transferred and locked up where you're gonna be locked up for, you know, more time. I don't think you're gonna get it at the jail you're goin' to here."

3. April 18, 2002 Interview:

Detective Bayles and Detective Stomsvik again advised defendant of his *Miranda* rights before they questioned him. Defendant immediately retracted his earlier admissions, denying he had a gun or shot either Victor or Cheryl. He told the detectives he took responsibility for firing the 9-millimeter handgun at Victor because he heard that Sirrano, who was "still on the run," had threatened to shoot Jaynelle. However, defendant gave vague and inconsistent accounts of how Sirrano's alleged threat was conveyed to him. He refused to divulge the phone number of the person he claimed had contacted him.

Detective Bayles expressed skepticism: "Now, Ladell, you took a polygraph test and you failed it miserably on the question of whether or not you shot people there that night. And after you failed it miserably you admitted after that, that you had shot Victor. Okay. It can't be both ways. The fact that you failed that polygraph test has a lot of weight in-in how we look at this."

Defendant acknowledged there had been a robbery plan to get "their stuff back," admitted he knew about the plan in advance, but continued to deny he had a firearm. He insisted his prior admission was motivated by the threat to Jaynelle. Defendant had no response when Detective Bayles asked, "Why didn't you say it right away then before you took the polygraph test?" Bayles continued: "You tried to hold your mud for a long time and stick with that story for hours. This-this is not going to fly. Okay. This is not the way it is. If it was, you would have passed that polygraph test. And if ... you were going to tell a lie about being responsible for this shooting, be it out of fear to protect your girl, you would have told that right away as soon as that news got to you. You wouldn't have had to go through all these things. We've been doing this for a long time, Ladell. [¶] ... [¶] You're wasting our time with this story."

(C050121 Opinion at 3-8) (emphasis in original).

Before trial, defense counsel moved to suppress Brown's statements, including the April 15, 2002 admission that he shot at Victor. Counsel argued that the detectives employed "coercive, inquisitorial tactics... to wrench a confession from [Brown] against his will..." (C050121 Opinion at 8.) The trial judge reviewed the video and audio tapes of Brown's interviews. *Id*. The defense presented the expert testimony of Dr. Ofshe, a retired professor of social psychology, who opined that Overall used techniques designed to induce Brown to admit that he shot Victor accidentally or in self defense by leading him to believe he would receive

11

1  leniency. *Id*. Ofshe did not offer an opinion as to whether defendant's admission or other

2  statements were true. *Id*. The trial court found that all of Brown's statements were made

3  voluntarily, and ruled them admissible. (RT at 90.)

4        In this petition, Brown claims that the trial court erred in allowing his confession[2]

5  to come into evidence because it was "the involuntary result of the officer's coercive and false

6  promise that [he] would be able to see his baby boy when he was born if he confessed." (Petition

7  at Brief, p. 18.)

8        The United States Constitution demands that confessions be made voluntarily in

9  order to be admissible at trial. *Lego v. Twomey*, 404 U.S. 477, 478 (1972). A confession is

10  voluntary if it is "the product of a rational intellect and a free will." *Medeiros v. Shimoda*, 889

11  F.2d 819, 823 (9th Cir. 1989) (quoting *Townsend v. Sain*, 372 U.S. 293, 307 (1963)); *see also*

12  *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960). The test for voluntariness, however, is not a

13  simple question of whether the suspect spoke of free will. Rather, "coercive police activity is a

14  necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the

15  Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167

16  (1986).

17        The relevant question is whether it appears, by preponderance of the evidence,

18  that Brown's statement was the result of his will being overborne by coercive police conduct.

19  *Arizona v. Fulminante*, 499 U.S. 279, 288 (1991) (whether defendant's statement is "the product

20

21     [2] Respondent asserts that Brown never gave a full confession, but rather, only an admission. Respondent is correct, as Brown maintained that he shot at Victor only to protect

22  himself after Victor charged at him, and did not acknowledge guilt of the crimes with which he was charged. *See Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (distinguishing between an

23  admission and a "full confession"); *see also* CALJIC 2.70.

24     Brown's pretrial "confession" to firearm use during the robbery will hereinafter be referred to as an admission, as it was classified by the state appellate court. (C050121 opinion at 9.) The applicable federal law is unchanged. *See Fulminante*, 499 U.S. 279 (not distinguishing

25  between incriminating statements, admissions, and confessions in application of the test for coercion); *Blackburn*, 361 U.S. 1999 (repeatedly referring to the confession at issue as a

26  "statement").

1   of coercion" by law enforcement depends on whether his "will was overborne"); *Connelly*, 479

2   U.S. at 168 (reaffirming that "the voluntariness of a confession need only be established by a

3   preponderance of the evidence").  The inquiry must be based on the totality of the circumstances.

4   *See Winthrow v. Williams*, 507 U.S. 680, 711-12 (1993).  Relevant factors to consider may

5   include the youth of the accused, lack of education, low intelligence, lack of advice to the

6   accused of his constitutional rights, the length of detention, the repeated and prolonged nature of

7   the questioning, or the use of physical punishment such as deprivation of food or sleep).

8   *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).

9           The state appellate court concluded that the trial court did not err in admitting any

10  of Brown's pretrial statements because they were made voluntarily:

11          Defendant acknowledges that "[s]ome of Overall's pressure tactics
            were lawful." He nonetheless argues it was unlawful for Overall to
12          "explicitly promise[ ][him] that he would be able to be with his
            baby boy when he was born if he confessed to being armed and
13          shooting Victor Jones during the attempted robbery." Defendant
            contends that "Overall's promise was deceptive, rather than an
14          accurate explanation of the possible consequences [defendant]
            could expect.... Overall's promise that confessing would help
15          [defendant] to be free to see his baby boy at his birth was altogether dishonest."

16          Contrary to defendant's argument, Overall made no coercive or
            deceptive "promises." We defer to the trial court's factual findings
17          under the "deferential substantial evidence standard." (*Williams,
            supra,* 16 Cal.4th at pp. 659-660.) The record supports the finding
18          that Overall's tactics did not overcome defendant's exercise of free
            will. Defendant continued to deny any involvement in the shooting
19          until Overall suggested Victor might have been the aggressor. The
            correctness of the trial court's finding is also demonstrated by
20          defendant's conduct following the interrogation by Overall. First, at
            the end of the ensuing interview with Bayles and Stomsvik,
21          defendant asked the detectives for a "big favor." He wanted to kiss
            his girl's stomach and talk to his baby. Defendant would not have
22          asked for a "favor" if he took Overall's statements as a promise he
            would be released for telling the truth. Second, defendant retracted
23          his admissions three days later without any reference to Overall's
            interrogation tactics as the cause. He claimed he lied because
24          Sirrano threatened to shoot Jaynelle. Moreover, the 245-page
            record of the April 15, 2002, interview supports the trial court's
25          finding that Overall's methods were proper. Overall *Mirandized*
            defendant and emphasized from the start that after administering
26          the polygraph examination, she would report to the Sheriff's Office

13

about his truthfulness. This included reporting his side of the story, but only if he told her the truth. She urged defendant to tell the truth to controvert the version of events Dante or Sirrano might give to police.

The topic of the baby arose fewer than 10 times during Overall's lengthy interrogation. Defendant first raised the issue in response to Overall's background questions. When asked about his marital status, defendant responded that Jaynelle was pregnant with his first child and he hoped to be able to see it born. Overall said, "That would be nice," and went on to another question. Defendant also told Overall that the best thing that ever happened to him was Jaynelle getting pregnant. Overall turned to a different topic. After the polygraph exam, Overall observed that defendant was involved in "some heavy stuff." She continued: "I wish your life could have been different, and I still think you can make it different.... I want you to see that-that baby be born. I don't know why, but I feel like it's a boy." Overall warned that "only the truth" would allow him "to be with [his] child and have a life." She told him that "[t]he truth is what's gonna let you be there for your baby...." Overall urged him to do the right thing for himself, Jaynelle and the baby. Just before defendant stopped denying that he shot anyone, he said, "I'm never going to be able to hold my baby." Overall responded, "Yes, you will." Defendant admitted he shot Victor, then told Overall he wished he could go to his baby "right now." After asking defendant if he had seen Jaynelle since his arrest, she asked defendant if he wanted the detectives to return. Thereafter, Overall told Bayles and Stomsvik about defendant's desire to see his baby. At no time did she promise defendant he would be freed. Indeed, Overall repeatedly emphasized that the polygraph showed he was lying about not being a shooter and that he was, in fact, in serious trouble.

Nor does the record support defendant's claim that his admissions were the result of coercion. It is clear that defendant did not view Overall's reassurances that he would be able to see his baby as promises of leniency. After Overall left the April 15 interview, defendant repeated his new story to Bayles and Stomsvik. Then, at the close of the interview, he asked the two detectives for a "big favor"-to be allowed to kiss his girl's stomach and talk to his baby. Bayles explained there would be no contact visit "until this whole thing is settled...." Defendant would not have asked the question had he believed he had been promised leniency in regard to seeing the baby. It is also significant, as the trial court recognized, that defendant never claimed coercion by Overall when he retracted his admissions three days later. He stated repeatedly that he lied because Sirrano had threatened to shoot Jaynelle. Nor is there anything in the record to support defendant's only explanation for defendant's failure to claim coercion as a basis for changing his story-that he "may not have wanted to admit to the detectives that Overall's promise had duped him into incriminating himself,

14

perhaps out of concern that the detectives would view him as someone who could be easily deceived and manipulated." Based on our independent review, we conclude defendant's admissions were voluntary.

(C050121 Opinion at 9-11.)

The lengthy interrogation transcripts have been reviewed in their entirety.  (CT at 1088-1448.)  Considering the relevant factors under *Schneckloth* and the totality of the circumstances of the interrogations, it does not appear that any of Brown's statements were the result of his will being overborne by coercive police conduct.

First, Overall's references to Brown's unborn baby do not appear sufficiently compelling to be deemed coercive.  *See Connelly*, 479 U.S. at 164 (noting that all Supreme Court decisions finding a confession to be involuntary "have contained a *substantial* element of coercive police conduct") (emphasis added); *see also, e.g.*, *Mincey v. Arizona,* 437 U.S. 385 (1978) (defendant subjected to 4-hour interrogation while incapacitated and sedated in intensive-care unit); *Greenwald v. Wisconsin,* 390 U.S. 519 (1968) (defendant, on medication, interrogated for over 18 hours without food or sleep); *Beecher v. Alabama,* 389 U.S. 35 (1967) (police officers held gun to the head of wounded confessant to extract confession); *Davis v. North Carolina,* 384 U.S. 737 (1966) (16 days of incommunicado interrogation in closed cell without windows, limited food, and coercive tactics); *Reck v. Pate,* 367 U.S. 433 (1961) (defendant held for four days with inadequate food and medical attention until confession obtained); *Culombe v. Connecticut,* 367 U.S. 568 (1961) (defendant held for five days of repeated questioning during which police employed coercive tactics).

Even assuming, arguendo, that Overall's statements were coercive, it does not appear that Brown's will was overborne.  Rather, as respondent asserts, it appears that Brown finally admitted to firearm use because he realized that his attempts to deny involvement were failing miserably, not because he truly believed he would be able to see the birth of his child if he confessed.  That he came to regret his admission later does not, of course, render it involuntary.

15

1    Upon the record of this case, the determination of the state appellate court that

2   Brown's statements were voluntary is not contrary to, or an unreasonable application of, any

3   federal law as set forth by the Supreme Court.  Nor is it based on an unreasonable determination

4   of the facts in light of the evidence.

5    Moreover, any error by the trial court in allowing Brown's admission into

6   evidence was harmless.  Where an involuntary statement is improperly admitted at trial, a

7   reviewing court must apply a harmless error analysis, assessing the error "in the context of other

8   evidence presented in order to determine whether its admission was harmless beyond a

9   reasonable doubt." *Fulminante*, 499 U.S. at 308.  In the context of habeas corpus review, the

10   standard to be applied is whether the error had substantial and injurious effect or influence in

11   determining the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).  If there is

12   "grave doubt" whether a constitutional error substantially influenced the verdict, then the error

13   was not harmless. *Sims v. Brown*, 425 F.3d at 560, 570 (9th Cir. 2005).

14    Here, the evidence apart from Brown's admission and other pre-trial statements

15   was dominated by the testimony of Victor, who was present during the relevant events.  (RT at

16   352-493.)  Although it was established through cross examination that Victor had consumed a

17   considerable amount of crack cocaine in the 24 hours preceding the crimes (RT at 430-39), there

18   was no evidence that his drug use had any particular effect on his ability to perceive and recall

19   the relevant events.  Moreover, there was evidence that his perception and recall were not

20   substantially impaired.  Many details in Victor's testimony about the incident were confirmed by

21   either forensic evidence or Brown's pretrial statements.

22    For example, Victor testified that the seating arrangement in the lead vehicle

23   consisted of Johtell driving and Dante behind her, and Cheryl in front passenger seat with Victor

24   behind her.  (RT at 396.)  Brown confirmed the same seating arrangement, indicating that Dante

25   and Johtell exited from the driver side of the lead car (CT at 1146-47), while Victor and Cheryl

26   exited from the passenger side of the lead car (CT at 1147), with Cheryl in the front and Victor

1   and Dante in the back.  (CT at 1238-39; 1344.)  Victor testified that a trail car followed them and

2   flashed its headlamps twice at the lead car.  (RT at 400-01; 404.)  Brown confirmed that there

3   was a trail car and that it flashed its high beams twice at the lead car.  (CT at 1140; 1146; 1238;

4   1342-43.)

5           Victor testified that Dante and Johtell exited the lead car before a third person

6   approached from the trail car (RT at 405; 455; 459), and that the third person approached on the

7   "passenger rear driver's side" of the lead car carrying a long gun.  (RT at 406-07.)  Brown

8   confirmed this account to the extent he admitted that Dante and Johtell jumped out of the lead car

9   before anyone exited the trail car (CT at 1345-46), that a third person approached the lead car

10  from the trail car after Dante and Johtell exited (CT at 1146-47) (claiming that it was a man

11  named "Anthony"), that the third person's approach was on the driver's side of the lead vehicle

12  (CT at 1178-1179) (after admitting that it was himself), and that a person from the trail car had a

13  "long" or "pretty big" gun.  (CT at 1144-45; 1240; 1402) (though claiming it was Sirrano

14  Haywood rather than himself).  Victor testified that the second firearm at the scene was a

15  handgun, which Dante displayed.  (RT at 405).  Petitioner confirmed that the other firearm at the

16  scene was a handgun, and that Dante had that handgun at one point.  (CT at 1155-57; 1240.)

17          Finally, Victor testified that the person with the long gun fired the shot which

18  killed Cheryl (RT at 422), and that the shot was fired while Cheryl knelt.  (RT at 419; 451; 461.)

19  Forensic evidence which Victor had not viewed confirmed his account to the extent that (1) as

20  between the handgun and long gun, the fatal bullet would have been from the long gun (RT at

21  234; 237-38) and (2) the bullet was fired at close range and traveled diagonally through Cheryl's

22  body after entering from the upper back.[3]  (RT at 229-32; 258; 260.)

23          In sum, the evidence showed that Victor was able to accurately perceive and recall

24  many details of the events leading up to the shootings.  He further testified that he saw both

25  _____

26  [3] Victor indicated, however, that Cheryl was facing the shooter, while forensic evidence indicated that she was facing away from the shooter.  (RT at 451; 461.)

1    Brown and Dante shoot at him and that he saw Brown shoot and kill Cheryl.  (RT at 418-20.)  A

2    detective testified that Victor viewed a photographic lineup with a picture of Sirrano Haywood

3    (RT at 518-19), whom Brown claims was the fourth robber at the scene.  Victor did not identify

4    Haywood as either of the shooters.  *Id.*

5         Brown did not give a full confession which would tempt the jury to rely on that

6    evidence alone in reaching its decision, as was described in *Fulminante*.  499 U.S. at 296 ("a full

7    confession in which the defendant discloses the motive for and means of the crime may tempt the

8    jury to rely upon that evidence alone in reaching its decision").  Brown admitted only to shooting

9    in Victor's direction to protect himself after Victor "charged at him."  Yet after substantial and

10   unrebutted eyewitness testimony, the jury convicted him of first degree murder (Cheryl),

11   attempted murder (Victor), and attempted robbery with enhancements for firearm use.  Brown's

12   admission solely to the firearm use did not substantially influence this jury verdict.  The alleged

13   error with respect to Brown's firearm use admission was harmless beyond a reasonable doubt.

14        B.    Expert Testimony

15        After the trial court ruled that Brown's firearm use admission could come into

16   evidence, the defense offered Dr. Ofshe as an expert witness to explain to the jury "how some of

17   the interrogators' tactics had the potential of inducing [Brown's] confession."  (Petition at Brief,

18   p.37.)  The trial judge recognized that his finding that the admission was voluntary did not

19   automatically render Ofshe's testimony irrelevant (RT at 90), but ultimately declined to admit it.

20   (RT at 91.)

21        The trial judge found that Ofshe's testimony did not relate to a subject beyond the

22   juror's common experience, and thus would not be helpful to the jurors as they assessed the

23   credibility of Brown's firearm use admission.  (RT at 86; 90-92.)  The judge explained that a

24   significant factor in his decision was the fact that Brown made no reference to the interrogator's

25   techniques when he retracted the firearm use admission, nor did he indicate any unsureness as to

26   why he gave the false statement.  Rather, Brown unequivocally stated that he "confessed"

because someone had threatened to shoot his girlfriend if he did not take responsibility.  (RT at 90.)  In light of Brown's explanation for the alleged false admission, the judge reasoned that Ofshe's opinion regarding interrogation techniques would not assist the jury in assessing the credibility of the admission.  *Id*.  Brown claims that this evidentiary ruling deprived him of his constitutional right to present a complete defense.  (Petition at Brief, p.37.)

Criminal defendants have a fundamental due process right, implicit in the Sixth Amendment, to present a complete defense.  *Washington v. Texas*, 388 U.S. 14, 19 (1967); *see also Crane v. Kentucky*, 476 U.S. 683, 690 (1986).  However, that right is not unlimited.  *Greene v. Lambert*, 288 F.3d 1081, 1090 (9th Cir. 2002).  A state law justification for exclusion of evidence does not abridge a criminal defendant's right to present a defense unless it is "arbitrary or disproportionate" and "infringe[s] upon a weighty interest of the accused."  *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *Crane*, 476 U.S. at 689-91 (discussing the tension between the discretion of state courts to exclude evidence at trial and the federal constitutional right to "present a complete defense").

At Brown's trial, the jury ultimately heard, in defense counsel's closing argument, the general concepts that would have been described by Ofshe if he had testified.  (RT at 617-21.)  The jury was also presented with the video and audio tapes of Brown's statements.  Defense counsel requested the jury to consider carefully the videotaped interrogation.  Counsel argued that Brown's interrogators used "coercive" techniques and asserted that "the officers promised him he would be with his kid if he made a certain type of statement."  (RT at 621.)  Thus, the jury clearly had the opportunity to evaluate the defense theory of the case.  The exclusion of Ofshe's testimony did not prevent Brown from presenting a complete defense.  *Cf. Conde v. Henry*, 198 F.3d 734, 741 (9th Cir. 1999) (trial court violated petitioner's right to due process where it improperly precluded defendant's attorney from making closing argument explaining the defendant's theory of the case, refused to instruct the jury on the defendant's theory and, over the defendant's objection, gave erroneous instructions that did not require that the jury find every

1   element of the offense).

2        Since Brown was not prevented from presenting a complete defense, the state

3   court's evidentiary ruling can be grounds for federal habeas corpus relief only if the exclusion of

4   the expert testimony rendered the trial so fundamentally unfair as to violate due process.  *See*

5   *Estelle*, 502 U.S. at 67-68; *Drayden v. White*, 232 F.3d 704, 710 (9th Cir. 2000), *cert. denied*,

6   532 U.S. 984 (2001).

7        The Supreme Court has recognized that evidence about the manner in which a

8   confession is obtained is often highly relevant to its reliability and credibility.  *Crane*, 476 U.S. at

9   688-91; *Jackson v. Denno*, 378 U.S. 368, 386 n.13 (1964).  "[A] defendant's  case may stand or

10  fall on his ability to convince the jury that the manner in which the conviction was obtained casts

11  doubt on its credibility."  *Crane*, 476 U.S. at 689.  To constitute a due process violation under

12  federal standards, the excluded evidence must have been (1) reliable, and (2) critical to the

13  defense theory of the case.  *Id*. at 690.

14       *Crane* involved a sixteen year old defendant who contended he confessed after

15  having been "detained in a windowless room for a protracted period of time, surrounded by as

16  many as six police officers during the interrogation, repeatedly... denied permission to telephone

17  his mother, and badgered into making a false confession."  476 U.S. at 685.  Crane was

18  precluded from "introduc[ing] testimony about the environment in which the police secured his

19  confession," which the Supreme Court held violated his constitutional right to present a complete

20  defense.  *Id*. at 691.  In significant contrast, the circumstances of Brown's admission and other

21  statements were readily apparent to the jury through the video and audio tapes of his

22  interrogations played at trial.  *See Ritt v. Dingle*, 142 F.Supp.2d 1142, 1145 (D.Minn. 2001)

23  ("Petitioner was allowed to present to the jury a videotape of her interrogation... which showed

24  the circumstances of her confession... Given the more direct evidence of the videotape, the trial

25  court's decision to exclude expert testimony on the interrogation technique was reasonable")

26  (internal citation omitted).

1        Moreover, while *Crane* clearly establishes that excluded evidence must be reliable

2   in order to violate due process, the case does not address expert testimony or how to assess its

3   reliability.  *See Id*. at 1145 ("Petitioner's reliance on *Crane* for the admissibility of the proffered

4   expert testimony is misplaced as *Crane* does not discuss expert testimony in a similar factual

5   context").  At Brown's trial, the judge stated that, due to specific facts before the Court (Brown's

6   explanation when he retracted the admission), there was doubt as to the reliability of Ofshe's

7   testimony in relation to the admission.  (RT at 91.)  Given the lack of guidance in *Crane* or any

8   other United States Supreme Court precedent, the state appellate court's determination that

9   Ofshe's testimony was properly excluded (C050121 opinion at 12) is not an unreasonable

10  application of clearly established law as determined by the Supreme Court.  Nor is it based on an

11  unreasonable determination of the facts in light of the evidence.

12       In any event, any error in excluding the expert testimony was harmless beyond a

13  reasonable doubt under the *Brecht* standard.  (See Subsection A, *supra*.)  The jury had the

14  opportunity to evaluate the defense theory of the case and, specifically, whether Brown's pre-trial

15  statements were unreliable due to the alleged coercive questioning.  To the extent the jury

16  decided to rely on Brown's admission, the sole question for their consideration was whether it

17  was *true*.  Ofshe was not in a position to offer anything useful in this regard.  He had no expert

18  opinion whether Brown's admission was true (RT at 48), and had no special expertise as to the

19  truth or falsity of the remainder of Brown's statements.  (RT at 56.)  Upon the record of this case,

20  the exclusion of Ofshe's testimony did not have had a substantial and injurious effect on the jury

21  verdict at Brown's trial.  *See Brecht*, 507 U.S. at 637.

22                          V.  CONCLUSION

23       For all the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's

24  application for writ of habeas corpus be DENIED.

25       These findings and recommendations are submitted to the United States District

26  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

21

days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED: February 20, 2009

CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE